# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

### CASE NO. _____

| |
|---|
| HILLCOUR, INC. <br> VINCENT'S DRUG STORE AND <br> SODA FOUNTAIN, INC., and <br> DAMIEN LAMENDOLA, <br><br>          Plaintiffs, <br><br>     v. <br><br> APPLE ADVANCE LLC, <br> DYNASTY CAPITAL 26 LLC, <br> EPIC ADVANCE LLC, <br> OVERTIME CAPITAL INC., <br> TIMELESS FUNDING, LLC, and <br> JOHN and JANE DOE DEFENDANTS, <br><br>          Defendants. |

## VERIFIED COMPLAINT

Plaintiffs, HILLCOUR, INC., VINCENT'S DRUG STORE AND SODA FOUNTAIN, INC., and DAMIEN LAMENDOLA (collectively, Plaintiffs) sue Defendants, APPLE ADVANCE LLC, DYNASTY CAPITAL 26 LLC, EPIC ADVANCE LLC, OVERTIME CAPITAL INC., TIMELESS FUNDING, LLC (collectively, the "MCA-Funder Defendants") as well as the JOHN and JANE DOE DEFENDANTS (the "John/Jane Doe Defendants") hereby submit this amended Complaint and, in support hereof, states as follows:

### I.  SUMMARY OF THE CLAIMS

1. This lawsuit is brought by two commonly controlled companies, HILLCOUR, INC. ("Hillcour") and VINCENT'S DRUG STORE AND SODA FOUNTAIN, INC. ("Vincent's Drug Store"), and DAMIEN LAMENDOLA, together with their principal, DAMIEN LAMENDOLA ("Mr. Lamendola") against various defendants who are in the business of

offering, funding and collecting upon unlawful and carefully disguised predatory loans masquerading as purchases of future receivables of merchants like Hillcour and Vincent's Drug Store.

2.     Each of the MCA-Funder Defendants are business funders who prey upon their victims by offering them funding in the form of so-called a "merchant cash advance" or "MCA". MCA agreements are financial products, often marketed to small businesses through high-pressure sales operations resembling "boiler rooms," that purport to purchase at a discount a portion of a business's future receivables.   Many of the MCA-Funder Defendants are commonly owned and managed.

3.     In reality, however, these merchant cash advances are unlawful, usurious loans with interest rates that, when annualized, that are equivalent to between 163% and over an incredible 750% per annum, far above the maximum rate permissible for a loan under New York or Florida law.  These MCA funders then deduct daily or weekly amounts directly from either Hillcour's or Vincent's Drug Store's bank account regardless of the amount of receipts that company earned that day.

4.     In an attempt to evade applicable usury statutes, the loans are disguised as a purchase and sale of future receivables agreement, but the terms, conditions and MCA-Funder Defendants' actions demonstrate that, despite the agreement's form, no sale of receivables ever took place.  Rather, each agreement was intended to be a loan from inception and MCA-Funder Defendants' conduct and the documents plainly demonstrate that each MCA-Funder Defendant never actually purchased any receivables or future receipts but, rather use this false construct to hide the unlawful loan transaction.

5.     Indeed, neither company ever had any receivables to sell.  Hillcour is simply a holding company that owns the stock in other subsidiary entities.  There are not receivables that it receives from any customers.  Ever.  Vincent's Drug Store is a retailer that sells food and

beverages and other drug and sundry items.  Vincent's Drug Store makes its sales in exchange for the simultaneous collection of cash or cash equivalent (a credit card payment) and, thus, there never were any 'account receivables' or 'future receivables' to be sold or purchased by an MCA-Funder Defendant. Since there are no receivables of either company, it is even more obvious that there could have been no purchase and sale of receivables and the transactions between Plaintiffs and each of the MCA-Funder Defendants indisputably were loans with criminally usurious interest rates.  There was never any transfer of risk of non-collection of the receivables, a hallmark of a true sale of receivables.

6.      While it is bad enough when a merchant/business has one or two merchant cash advances, the harm is multiplied and compounded in situations like the within case where a business (like Hillcour) is forced to take a second MCA in order to keep up the payments on the first MCA, then a third MCA to keep up the payments on the first and second MCAs and to keep the business afloat by replacing the money being automatically deducted each day from the company's bank account by other funders regardless of such company's daily receipts.

7.      Before long, Hillcour had four (4) different MCA agreements, and the MCA-Funder Defendants were collectively debiting the Hillcour's bank accounts for <u>over $490,000.00 per week</u> – a sum which is more than this company was earning.

8.      It is against this backdrop that Plaintiffs bring claims against these MCA-Funder Defendants (including the John and Jane Doe Defendants) sounding in RICO, racketeering conspiracy and breach of contract.

**II.    <u>THE PARTIES</u>**

9.      Plaintiff, Hillcour, is a Florida corporation.  Hillcour is a holding company that has no customers, has no sales, provides no services and certainly has no receivables to sell to a third-party.  Hillcour only generates funds from voluntary distributions from one of the other companies that it controls/owns.  It has no regular revenue stream in the ordinary course of its

business operations.

10.    Plaintiff, Vincent's Drug Store, is a South Carolina corporation which owns and operates a retail store and restaurant.  Vincent's Drug Store's income is derived solely from point of sale transactions (cash or credit card purchases) and it also has no receivables that could be sold to a third-party.

11.    Plaintiff, DAMIEN LAMENDOLA, resides in, and is a citizen of, the State of Florida and is the principal/president of both corporate Plaintiffs.

12.    Defendant, APPLE ADVANCE LLC ("Apple Advance"), is a New York limited liability company with its principal place of business located in Kings County, New York.

13.    Defendant, DYNASTY CAPITAL 26 LLC ("Dynasty Capital"), is a New York limited liability company with its principal place of business located in Queens County, New York.

14.    Defendant, EPIC ADVANCE LLC ("Epic Advance"), is a New Jersey limited liability company with its principal place of business located in Ocean County, New Jersey.

15.    Defendant, OVERTIME CAPITAL INC. ("Overtime Capital"), is a New Yor corporation its principal place of business located in New York County, New York.

16.    Defendant, TIMELESS FUNDING LLC ("Timeless Funding"), is a New York limited liability company with its principal place of business located in Kings County, New York.

17.    The John/Jane Doe Defendants are:

a.    the various officers and owners of each of the MCA-Funder Defendant;

b.    the financial investors in the MCA-Funder Defendant (and often times, a financial investor provides the capital to back more than one MCA-Funder Defendants);

c.    the network of independently owned and operated brokers and Independent

4

Sales Organizations ("ISOs") who operate within the business lending space and are separately owned/operated intermediaries between businesses (like Hillcour and Vincent's Drug Store) and the funding companies (the MCA-Funder Defendants) that provide capital directly to the businesses.[1]

18.     Each of the John/Jane Doe Defendants participated in the illegal scheme, are a critical part thereof and their identities will be sought during the course of discovery in this case.

### III.    JURISDICTION AND VENUE

19.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U. S. C. §§ 1961–68.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and/or (3).

21.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant has voluntarily subjected itself/himself/herself to the jurisdiction of this Court; regularly transacts business within the State of New York, and/or has purposefully availed himself of the jurisdiction of this Court for the specific transactions at issue.

22.     Moreover, each of the MCA-Funder Defendants, in its MCA Agreement, provides that venue is proper in the State of New York and New York law applies.

23.     All conditions precedent to the bringing of this action have occurred, been performed or have been otherwise waived.

---

[1] Very often, it is the broker or ISO that has direct communication with the merchant businesses like Hillcour and Vincent's Drug Store and solicits them to obtain business funding through one or more of the MCA-Funder Defendants.  These independently owned and operated brokers and ISOs are critical to the enterprise and provide a steady stream of merchants to whom the MCA-Funder Defendants provide the funding.

IV.    **GENERAL ALLEGATIONS**

24.    Plaintiff, Hillcour, is a holding company that has no customers, has no sales, provides no services and certainly has no receivables to sell to a third-party.  Hillcour only generates funds from voluntary distributions flowing upwards from one of the other companies that it controls/owns.  It has no regular revenue stream in the ordinary course of its business operations.

25.    Plaintiff, Vincent's Drug Store, operates a single retail store and restaurant in John's Island, South Carolina.  Vincent's Drug Store's income is derived solely from immediate point of sale transactions (cash or credit card purchases).  For example, if someone purchases an ice cream cone, they pay with cash or credit card.  It is self-evident that Vincent's Drug Store has no receivables that could be sold to a third-party.

26.    Mr. Lamendola is the principal of both corporate plaintiffs and personally guaranteed all of the funding agreements at issue in this case.

27.    While these companies had previously relied primarily on traditional lenders, they recently fell victim to a group of funders who provide what has been called payday loans for business called merchant cash advances.

28.    The MCA-Funder Defendants loan money to merchants, like Hillcour and Vincent's Drug Store, under the guise of a merchant cash advance, which they describe as a 'purchase and sale of future receivables.'

29.    As a general matter, an issuer of a merchant cash advance provides a merchant with a lump sum payment in exchange for a share of the merchant's future receivables up to a certain total repayment amount.

30.    As a result, unlike a loan, a true merchant cash advance does not guarantee an issuer with a regular payment or a fixed, finite term.  Instead, payment amounts may vary

6

through a "reconciliation" process in which the issuer "reconciles" the merchant's payment amounts in accordance with the merchant's actual receivables.  Because payment amounts vary, the lengths of repayment terms also vary.

31.    This variability and lack of security create certain risks for funders but also create certain protections for merchants by being able to reduce required payments when business is slow.

32.    In contrast, a traditional closed-end installment loan has a fixed regular payment amount and a finite repayment term.  In exchange for the certainty this structure provides for creditors (and the rigidity it imposes on borrowers), New York law guarantees certain protections to loan borrowers, including a maximum annual interest rate of 16%. The law also imposes certain regulations on loan issuers, including the requirement of specialized licenses and regular oversight by governmental entities.

33.    The MCA-Funder Defendants herein attempt to style their transactions as a 'purchases of future receivables' in order to evade New York's 16% interest rate cap and the other legal protections and requirements that exist for loans.  But in fact, each of the MCA-Funder Defendant's transactions function as loans, and, as a result, their customers are entitled to the protections afforded to borrowers under New York law.

34.    The title to the agreements is a sham.  In form, substance and in every conceivable way, each of the MCA-Funder Defendant's agreements function as absolutely repayable loans with interest rates between 163% and over an incredible 750% per annum.

35.    Each of the MCA-Funder Defendants market and collect upon the cash advances as loans. They each require the recipient of the funding (here each of the business entity plaintiffs) to repay the loans through fixed daily or weekly payments, which are debited from the company's bank accounts at set amounts ranging here from $50,000.00 per week to a whopping $190,385.00 per week.  They require the loans to be repaid in short terms (anywhere from a mere

30 business days to 24 weeks for these MCA-Funder Defendants), at annual interest rates well above the 16% threshold that defines usury under New York law.  In fact, the annual interest rates charged by MCA-Funder Defendants here it anywhere from over 10 times this limit to over 45 times this legal limit.

36.     Unlike a true purchase of future receivables, these MCA-Funder Defendants do not set the daily or weekly payment amount as an actual, reality-based, percentage of a company's daily or weekly receipts, but they set the daily/weekly payment amount solely upon the term/length of the loan within which such MCA-Funder Defendant wants to be repaid.

37.     In other words, while each of the MCA-Funder Defendants had access, prior to preparing its form contract and prior to the funding, to all of the necessary financial records including the bank statements of the company, none of the MCA-Funder Defendants actually tailored the daily payment amount to such company's actual receipts.  Rather, they pretend to do so in order to circumvent laws designed to protect companies like the corporate Plaintiffs.

38.     Each MCA-Funder Defendant's agreements contains the following:

    a.  The amount of future receivables that the MCA-Funder Defendant was allegedly purchasing (i.e, Epic Advance allegedly purchased $600,000.00 of Hillcour's future receivables);

    b.  The percentage of future receivables allegedly being purchased (i.e., Epic Advance allegedly purchased 26.88% of Hillcour's future receivables);

    c.   The amount the funder was to pay to the company for the future receivables (i.e., Epic Advance agreed to pay $400,000.00 to Hillcour);[2] and

    d.   The daily or weekly amount to be removed via ACH from the bank account of Hillcour (i.e., Epic Advance was to debit Hillcour's bank account in the amount of $50,000.00 per week, which would mean the amount would be repaid in exactly 12 weekly payments of $50,000.00 (less than a 3-month term).

39.    The structure of each of the MCA-Funder Defendant's agreement is at odds with traditional receivable financing, or factoring.

40.    Traditional factoring is when a company sells its accounts receivable (or invoices) to another company (the Factor) in exchange for cash in advance of the accounts receivable (or invoice) payment due date.  The company sells and assigns its rights to collect its accounts receivable (or invoices) to the Factor in exchange for the initial cash advance, usually approximately 90% of the invoice amount.

41.    Accounts receivable factoring is used to smooth out the gaps in a company's cash flow caused by slow-paying customers.  Rather than waiting 30, 60 or 90 days for payment from a customer, factoring accounts receivable helps a business get paid immediately for goods and/or services it has already provided and for which an invoice has been issued to its customer.

42.    The traditional factoring arrangement follows the following steps:

---

[2] In every case, the MCA-Funder Defendant never actually funded the amount set forth in the agreement.  There were always deductions before the alleged purchase price was wire transferred to the Plaintiff company for items such as underwriting fees, origination fees, ACH set-up fees, due diligence fees, etc.  Taking the example of Epic Advance, while the purchase price was set at $400,000.00, only $360,000.00 was actually funded (10% less attributable to various fees).  A classic bait and switch.

a.  First, the Factor typically pay the Company most of the value of the invoice in advance.  The initial payment amounts vary depending on the industry, but can be as much as (or more than) 90%.

b.  Next, the Company's Customer pays the Factor directly for the full value of the invoice when due.

c.  Finally, the Factor pays the Company whatever remains between the amount it was originally advanced by the Factor and the invoice amount, less the agreed-upon fees.  The longer the Customer takes to pay the Factor, the more it will cost the Company.  For example, if the Company was advanced 90% of the value of the original invoice, and agreed to pay 2% per month and the Customer took two months to pay, the fees would be 4% of the value of the invoice.  After the Customer pays the Factor the invoice that was sold by the Company to the Factor, the Factor then pays the Company the remaining 6% of the value of the invoice.  Under this example, if the Company performed $5,000.00 worth of work for its Customer and sells that invoice to the Factor, the Factor will pay the Company an initial payment of $4,500.00 (90%).  If the Customer pays within the first month, the 2% fee is $100.00 but if if the Customer takes three months to pay, the total fees are 6% (or $300.00) and the Factor will pay the Company $200.00 once the Customer pays the invoice to the Factor.   Most of the time, the Factor will also charge a percentage of the invoice or other fees.

43.    Under a traditional factoring or receivables financing relationship, the funder/factor provides credit to a company based on the credit risk of the company's customers. Indeed, under a traditional factoring or receivables financing relationship, the financing/factoring company bears the risk if the company's customer goes out of business or otherwise fails to pay

10

the invoice.

44.     On the other hand, under each of the MCA-Funder Defendant's MCA Agreements (described in more detail below), the MCA-Funder Defendant never bears the risk of non-payment because under its agreement it will be repaid regardless of whether the company (here, Hillcour and Vincent's Drug Store) has its invoices/receivables paid by its own customers.

45.     To further evidence that the 'specified percentage of receivables purchased' is just an artifice in furtherance of pretending that each MCA-Funder Defendant is purchasing a fixed and specific set of receivables, during the three-month period during which each of the four MCA Agreements were executed by Hillcour in favor of Apple Advance, Dynasty Capital, Epic Advance and Overtime Capital, these MCA-Funder Defendants pretended to purchase from Hillcour Landscape over 106.88% of its weekly receipts from receivables.  Considering that a company can only sell or assign, at most, 100% of its receivables, the notion that these MCA-Funder Defendants collectively pretended to purchase over 106% of Hillcour's weekly receipts from receivables during this period is simply an impossible feat.

46.     Thus, at some point there was absolutely nothing for many of the MCA-Funder Defendants to have purchased from Hillcour even if the MCA agreements were actually based in reality and were a true purchase of future receivables.

47.     Indeed, as part of each MCA-Funder Defendant's pre-funding due diligence process, each MCA-Funder Defendant obtained the last three or six months bank statements for Hillcour.  In most cases, this is the total extent of the due diligence each Defendant conducts.  Thus, each subsequent MCA funder was aware of each of the previous/existing MCA agreements since they would be able to see from the bank statements and financial information submitted that, at the time, Hillcour was already paying several other MCA funder on a daily or weekly basis.  This alone should demonstrate how the entire 'purchase of future receivables' concept was a farce since it is impossible for Hillcour, for example, to sell over 106% of its

weekly receivables.

48.    Until Plaintiffs retained counsel, they did not fully understand the nature of the funding or the agreements that were signing.  They only knew that they were receiving an infusion of the immediate cash needed to fund the business operations, understood the amount they needed to repay, the daily or weekly payment amount and the length of time it would take to re-pay the repayment amount.  Plaintiffs never fully appreciated or understood that this transaction was designed as a *pretend* 'purchase of future receivables', nor was this ever properly explained to them.

## V.    BACKGROUND OF MCA INDUSTRY

### A.    The Predatory MCA Industry

49.    The merchant cash advance ("MCA") industry specializes in providing high-risk, high interest rate loans to small and mid-size businesses.  As a whole, the MCA industry seeks to hide within the gray areas of the law, attempting to take advantage of procedural remedies and loopholes in distant state courts to disguise its predatory lending practices.

50.    The Federal Deposit Insurance Corporation ("'FDIC") has stated that "predatory lending" involves at least one of the following elements: (1) making unaffordable loans based on the assets of the borrower rather than on the borrower's ability to repay an obligation; (2) inducing a borrower to refinance a loan repeatedly in order to charge high points and fees each time the loan is refinanced ... ; or (3) engaging in fraud or deception to conceal the true nature of the loan obligation, or ancillary products, from an unsuspecting and unsophisticated borrower."[3]

51.    MCA companies frequently require unaffordable payments that they know the debtor is unlikely to repay. They further leverage various legal and contractual processes to guarantee full repayment under the contracts. Generally speaking, MCA companies will sue a

---

[3] https://www.fdic.gov/news/financial-institution-letters/2007/fi107006a.html

borrower with the intent to obtain a default judgement, knowing that the borrower is unlikely to retain counsel because they cannot afford it. In other cases, MCA companies will initiate a lawsuit with the intent of forcing a borrower to enter into an onerous settlement agreement, whereby a debtor remains obligated to make all the remaining payments and waive any rights to prosecute a claim against the MCA lender.

      B.    **MCA Agreements Are Substantively and Procedurally Unconscionable**

52.    Generally, MCA agreements (the "MCA Agreements") are unconscionable contracts of adhesion that are not negotiated at arms-length. MCA Agreements further target businesses facing a cash crunch and possible closure.

53.    Such agreements often contain many one-sided terms that seek to place all risk of loss on the borrower and maximize the lender's ability to collect full payment under the contract.

54.    Among the one-side terms that are typical in MCA Agreements are: (1) a provision giving the MCA company an irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name; (2) a provision preventing the merchant from transferring, moving or selling the business or any assets without permission from the MCA company, (3) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around; (4) venue and choice-of-law provisions requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction with substantive law more favorable to the MCA company, (5) waivers of the borrower's procedural defenses; (6) a personal guarantee, the revocation of which is an event of default, (7) a jury trial waiver, (8) a class action waiver, (9) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (10) a prohibition against obtaining financing from other sources, (11) an assignment of lease of the merchant's premises in favor of the MCA company, (12) the right to direct all credit card processing payments to the MCA company, (13) a power-of-attorney permitting the MCA

lender to take any action or execute any instrument or document to settle all obligations due; and (14) consent to electronic communications on behalf of the merchant and the merchant's associates in order to collect payment.

55.    Generally, MCA Agreements are also unconscionable because they contain numerous knowingly false statements. Among these knowingly false statements are that: (1) the transactions are not loans, (2) the daily or weekly payment is a good-faith estimate of the receivables, (3) the fixed daily or weekly payment is for the borrower's convenience, (4) there is no repayment term; (5) the automated ACH program is a labor-intensive (and not automated) process requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee.

56.    In addition, the MCA Agreements are unconscionable because they are designed to fail and cause the merchant to default. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant business suffers any downturn in revenues (1) because the reconciliation provision will not, in any case, result in an adjustment of the daily remittance; (2) by preventing the merchant from obtaining other financing, (3) and by requiring the merchant to continuously represent and warrant that there has been no material adverse changes, financial or otherwise, in such condition, operation, or ownership of the merchant.

57.    In addition, MCA agreements also generally contain numerous penalties that violate fundamental public policy concerns. Among these improper penalties, the MCA agreements (1) accelerate the entire debt upon an Event of Default, (2) waive any right to reconciliation after a short amount of time or after an Event of Default (which could be this missing of just one daily or weekly payment amount; and (3) require the merchant to turn over 100% of all of its receivables if it misses just one daily payment.

## VI.    SPECIFICS ABOUT THE MERCHANT CASH ADVANCE LENDERS

58.    Detailed below are the contractual agreements between each corporate Plaintiff and each of the MCA-funder Defendants.

### Apple Advance's Agreement with Hillcour

59.    Apple Advance originally promised to fund Hillcour the sum of $360,000.00.

60.    However, on December 2, 2025, Apple Advance forwarded documentation indicating that it was funding only $300,000.00 now and promised to fund an additional $60,000.00 immediately thereafter.

61.    Thus, on or about December 2, 2025, Apple Advance loaned Hillcour the sum of $300,000.00.  Apple Advance only funded $239,950.00 holding back $60,050.00 (over 20% of the funding amount) and attributing this to an original fee and/or underwriting fee.  See Exhibit A.

62.    In exchange, Hillcour was required to re-pay the sum of $495,000.00 over 30 daily (weekday) payments (which is less slightly more than a one month term).  See Exhibit A.

63.    Apple Advance required that Hillcour sign an authorization so that it would be paid via automatic deductions from Hillcour's bank account in the sum of $16,500.00 each weekday.  See Exhibit A.

64.    If annualized, the rate of interest charged on the money funded by Apple Advance to Hillcour is approximately 660% per annum (or 1058% if you take into account the $60,050.00 "origination fee" and/or "underwriting fee" charged).

65.    According to Apple Advance's agreement, it was pretending to purchase 25% of Hillcour's future receipts from its "customers and/or third-party payors".  See Exhibit A.

66.    But again, Hillcour was a holding company.  Hillcour had no customers or third-party payors.  This was known by Apple Advance.

67.    Apple Advance also required a personal guaranty from Mr. Lamendola.   See Exhibit A.

68.    Apple Advance also took a security interest in not only the receivables of Hillcour that it was pretending to purchase, but also took a security interest in virtually all of the assets of Hillcour including its equipment, general intangibles, instruments, inventory, etc. filed a UCC-1 on all such assets. See Exhibit A.

69.    Apple Advance also purportedly had entities that were not under the control of Plaintiffs sign a guaranty, although they indicated such entities have been "removed" from any paperwork.

70.    Once Hillcour concluded that Apple Advance was only funding a net sum of $239,950.00 rather than the $360,000.00 that was promised and agreed-upon, Hillcour immediately (on December 9, 2025) wired the sum of $239,950.00 to Apple Advance and advised Apple Advance that they should consider the agreement fully paid.

71.    In addition to the $239,950.00 sent back to Apple Advance, Apple Advance also received two $16,500.00 daily payments (for a total of an additional $33,000.00).  Rather than be satisfied with the fact that it received over a 114% of its actual funding amount in a matter of a few days, Apple Advance continues to insist on payment of *an additional $162,000.00* from Hillcour.

72.    Apple Advance has also commenced out-of-court collection activity against third-parties with whom Hillcour does business despite having no rights against such parties.

**Dynasty Capital's Agreement with Hillcour**

73.    On or about January 5, 2026, Dynasty Capital loaned Hillcour the sum of $1,250,000.00.  Dynasty Capital only funded $1,100,000.00.  Dynasty Capital charged Hillcour a astronomical $150,000.00 "Origination and Underwriting fee". See Exhibit B.

74. In exchange, Hillcour was required to re-pay the sum of $1,875,000.00 over 11 weekly payments (about a 2½-month term). See Exhibit B.

75. Dynasty Capital required Hillcour sign an authorization so that it would be paid via automatic deductions from Hillcour's bank account in the sum of $170,454.55 each week. See Exhibit B.

76. If annualized, the rate of interest on the money provided by Dynasty Capital is approximately 312% per annum (or 434% if you take into account the fees charged).[4]

77. According to Dynasty Capital's January 5, 2026 agreement, it pretended to be purchasing 30% of Hillcour's "Future Receipts". See Exhibit B.

78. "Future Receipts" is a defined term under Dynasty Capital's MCA agreement and it is defined as "all of the Seller's [Hillcour's] receipts of monies for the sale of its goods and services after the Effective Date of this Agreement." See Exhibit B.

79. However, as explained above, Hillcour is just a holding company. It does not sell goods or provide services. It has no "Future Receipts" to sell. This demonstrates that the entire structure of the 'purchase of future receivables' is a sham, a false construct to enable Dynasty Capital to issue a loan with a criminally usurious interest rate.

80. Dynasty Capital also required a personal guaranty from Mr. Lamendola. See Exhibit B. In addition, Dynasty Capital required that many of the other entities controlled by Mr. Lamendola also be "guarantors" under the MCA agreement, but were not defined as

---

[4] The effective interest rate on the loans issued by Dynasty Capital is even worse. The January 5, 2026 agreement (Exhibit B) is actually a renewal and early payoff of an existing/prior MCA agreement that Hillcour had with Dynasty Capital. In this case, Dynasty Capital approached Hillcour during the course of a prior agreement (when there was a balance remaining on that agreement of $650,000.00 and offered to "payoff" its own remaining $650,000.00 balance and fund new capital as well. As a result, the effective interest rate of the original $650,000.00 on the prior MCA agreement is "repaid" to Dynasty Capital on an even more expedited basis and, thus, the effective interest rate and return on its money is exponentially higher.

"merchants" and, thus, were not one of the pretend sellers of its "Future Receipts" or receivables. See Exhibit B.

81.    Dynasty Capital also took a security interest in not only the receivables of Hillcour that it was pretending to purchase, but also took a security interest in virtually all of the assets of Hillcour including its equipment, general intangibles, instruments, inventory, etc. filed a UCC-1 on all such assets. See Exhibit B.

82.    Dynasty Capital, at one point in time, agreed to an extension on payment dates. Despite this, Dynasty Capital had their counsel obtain a prejudgment writ of attachment in Connecticut.

83.    Dynasty Capital leveraged their position until Hillcour was forced to pay them off in full, despite Dynasty's agreement that they would extend the terms. It also appears that like Apple Advance, Dynasty snuck in entities that Plaintiffs do not control as additional guarantors.

**Epic Advance's Agreement with Hillcour**

84.    On or about November 25, 2025, Epic Advance loaned Hillcour the sum of $400,000.00.   Epic Advance only funded $360,000.00.   Epic Advance charged Hillcour a $40,000.00, or 10% fee with 5% being an "underwriting fee" and another 5% being an "origination fee". See Exhibit C.

85.    In exchange, Hillcour was required to re-pay the sum of $600,000.00 over 12 weekly payments (less than a 3-month term).  See Exhibit C.

86.    Epic Advance required Hillcour sign an authorization so that it would be paid via automatic deductions from Hillcour's bank account in the sum of $50,000.00 each week.  See Exhibit C.

87.    If annualized, the rate of interest on the money provided by Epic Advance is approximately 292% per annum (or 384% if you take into account the fees charged).

88.     According to Epic Advance's agreement, it pretended to be purchasing 26.88% of Hillcour's "Future Receipts".  See Exhibit C.

89.     "Future Receipts" is a defined term under Epic Advance's MCA agreement and it is defined as payments, receipts and funds received by Hillcour from its "customers' and/or other payors or obligors". See Exhibit C.

90.     Again, as explained above, Hillcour is just a holding company.  It does not sell goods or provide services.  It has no customers.  This demonstrates that the entire structure of the 'purchase of future receivables' is a sham, a false construct to enable Epic Advance to issue a loan with a criminally usurious interest rate.

91.     Epic Advance also required a personal guaranty from Mr. Lamendola.   See Exhibit C.  In addition, Epic Advance required that many of the other entities controlled by Mr. Lamendola also be "guarantors" under the MCA agreement, but were not defined as "merchants" and, thus, were not one of the pretend sellers of its "Future Receipts" or receivables. See Exhibit C.

92.     Epic Advance also took a security interest in not only the receivables of Hillcour that it was pretending to purchase, but also took a security interest in virtually all of the assets of Hillcour including its equipment, general intangibles, instruments, inventory, etc. filed a UCC-1 on all such assets. See Exhibit C.

**Overtime Capital's Agreement with Hillcour**

93.     On or about December 24, 2025, Overtime Capital loaned Hillcour the sum of $1,650,000.00.   Overtime Capital only funded $1,485,000.00.   Overtime Capital charged Hillcour an astronomical $165,000.00 (10%) "Origination Fee".  See Exhibit D.

94.     In exchange, Hillcour was required to re-pay the sum of $2,475,000.00 over 13 weekly payments (approximately a 3-month term).  See Exhibit D.

95.     Overtime Capital required Hillcour sign an authorization so that it would be paid via automatic deductions from Hillcour's bank account in the sum of $190,385.00 each week. See Exhibit D.

96.     If annualized, the rate of interest on the money provided by Overtime Capital is approximately 412% per annum (or 495% if you take into account the fees charged). [5]

97.     According to Overtime Capital's agreement, it pretended to be purchasing 25% of Hillcour's "Future Receipts".  See Exhibit D.

98.     "Future Receipts" is a defined term under Overtime Capital's MCA agreement and it is defined "the proceeds of each future sale made by Seller [Hillcour].  See Exhibit D.

99.     Again, as explained above, Hillcour is just a holding company.  It does not sell goods or provide services.  It has no customers.  This demonstrates that the entire structure of the 'purchase of future receivables' is a sham, a false construct to enable Overtime Capital to issue a loan with a criminally usurious interest rate.

100.     Overtime Capital also required a personal guaranty from Mr. Lamendola.  See Exhibit D.  In addition, Overtime Capital required that many of the other entities controlled by Mr. Lamendola also be "guarantors" under the MCA agreement, but were not defined as "merchants" and, thus, were not one of the pretend sellers of its "Future Receipts" or receivables. See Exhibit D.

---

[5] The effective interest rate on the loans issued by Overtime Capital is even worse.  The December 24, 2025 agreement (Exhibit D) is actually a renewal and early payoff of an existing/prior MCA agreement that Hillcour had with Overtime Capital.   In this case, Overtime Capital approached Hillcour during the course of a prior agreement (when there was a balance remaining on that agreement of $975,000.00 and offered to "payoff" its own remaining $975,000.00 balance and fund new capital as well.  As a result, the effective interest rate of the original $975,000.00 on the prior MCA agreement is "repaid" to Overtime Capital on an even more expedited basis and, thus, the effective interest rate and return on its money is exponentially higher.

101. Overtime Capital also took a security interest in not only the receivables of Hillcour that it was pretending to purchase, but also took a security interest in virtually all of the assets of Hillcour including its equipment, general intangibles, instruments, inventory, etc. filed a UCC-1 on all such assets. See Exhibit D.

**Timeless Funding's Agreement with Vincent's Drug Store**

102. On or about October 20, 2025, Timeless Funding loaned Vincent's Drug Store the sum of $1,000,000.00. Timeless Funding only funded $900,000.00. Timeless Funding charged Vincent's Drug Store a $100,000.00, or 10% fee as an "Origination Fee". See Exhibit E.

103. In exchange, Vincent's Drug Store was required to re-pay the sum of $1,500,000.00 over 24 weekly payments (less than a 6-month term). See Exhibit E.

104. Timeless Funding required Vincent's Drug Store sign an authorization so that it would be paid via automatic deductions from Vincent's Drug Store's bank account in the sum of $62,500.00 each week. See Exhibit E.

105. If annualized, the rate of interest on the money provided by Timeless Funding is approximately 163% per annum (or 213% if you take into account the fees charged).

106. According to Timeless Funding's agreement, it pretended to be purchasing 35% of Vincent's Drug Store's "Receivables". See Exhibit E.

107. Vincent's Drug Store owns and operates a retail store/restaurant that sells food and beverages as well as drug and sundry items. Vincent's Drug Store makes its sales in exchange for the simultaneous collection of cash or cash equivalent (a credit card payment) and, thus, there never are any "Receivables" to be sold to, or purchased by, Timeless Funding. This demonstrates that the entire structure of the 'purchase of future receivables' is a sham, a false construct to enable Timeless Funding to issue a loan with a criminally usurious interest rate.

108. Timeless Funding also required a personal guaranty from both Hillcour and Mr. Lamendola. See Exhibit E. In addition, Timeless Funding required that many of the other

entities controlled by Mr. Lamendola also be "guarantors" under the MCA agreement. See Exhibit E.

## VII. THE DEFENDANTS WERE NEVER PURCHASING FUTURE RECEIVABLES, BUT WERE CONSTRUCTING A LOAN TRANSACTION WITH CRIMINALLY USURIOUS INTEREST

### A.    The Percentage of Future Receipts Purchased Has No Basis In Reality

109.    As proof that the 'percentage of future receipts purchased' is a complete sham and has no basis in reality one only needs to compare two or more agreements.  The best example of how both the weekly payment amount and the percentage of receivables purchased are numbers simply reverse-engineered by the MCA funder to fit into the time period within which the MCA funder wants to be re-paid is to compare two of the loans issued to Hillcour by Epic Advance and Overtime Capital.

110.    These two loans were issued only a few weeks apart (Epic Advance funded on November 25, 2025 and Overtime Capital on December 24, 2025.  See Exhibits C and D.

111.    In the November 25, 2025 MCA agreement, Epic Advance pretended that it is purchasing 26.88% of Hillcour's weekly receipts.  Based upon its apparent underwriting -- which consisted exclusively of an examination of the past few months of Hillcour's bank statements – Epic Advance concluded that 26.88% of Hillcour's weekly receipts is $50,000.00. Thus, Epic Advance set its automatic weekly ACH payment amount for the November 25, 2025 MCA agreement at $50,000.00.  See Exhibit C.

112.    Less than a month later, Overtime Capital pretended that it is purchasing 25% of Hillcour's weekly future receipts (a nearly identical percentage). Thus, its calculation of the weekly payment for 25% of the weekly receipts should be about the same as the calculation for Epic Advance.  After all, Overtime Capital's underwriting also consisted exclusively of an examination of the same past few months of Hillcour's bank statements.  But Overtime Capital did not conclude that 25% of Hillcour's weekly receipts was even close to $50,000.00.  Overtime

Capital set the weekly payment amount at $190,385.00 per week (almost four (4) times the amount) when it pretended to purchase almost the exact same percentage of Hillcour's weekly receipts. See Exhibit D.

113.    This demonstrates that the numbers in these agreements are just filled-in by the Defendants to support the sham that these MCA-Funder Defendants are just pretending to be purchasing a specific percentage of future receipts when they are actually issuing loans with criminally usurious interest rates.

114.    In other words, the 'percentage of future receipts' and the 'daily payments amount' is simply a product of how quickly the MCA-Funder Defendant wants to be re-paid.  In the case of Epic Advance, it was funding $400,000.00 and was required to be repaid $600,000.00 over the course of 12 weeks.  Thus, Epic Advance set its weekly payment amount (pretending to be purchasing 26.88% of Hillcour's revenue) at $50,000.00 per week ($600,000.00 divided by 12 weeks is $50,000.00 per week).  Epic Advance was loaning $400,000.00 (less fees) to be repaid $600,000.00 and this is referred to a "1.5 agreement" since it a producing a return rate of 1.5%. The 1.5% return was to be received over the course of less than three months.  If annualized, the effective interest rate is approximately 300%.

115.    Under the MCA agreement with Overtime Capital, Overtime Capital was funding $1,650,000.00 and was requiring to be repaid $2,475,000.00 (also a "1.5 agreement").  Overtime Capital was using just about an identical repayment period, 13 weeks for Overtime Capital rather than 12 weeks for Epic Advance.  Thus, Overtime Capital's MCA agreement states that it was purchasing 25% of Hillcour's weekly receivables which is determined (from the same bank statements) was $190,385.00 per week (as opposed to $50,000.00 determined by Epic Advance).

116.    The weekly payment amount set by Overtime Capital in its agreement had absolutely no correlation to the weekly receivables collected by Hillcour (or the pretend percentage of future receivables it was allegedly selling).  Rather, it was just a product of

dividing the amount Overtime Capital demanded to be repaid ($2,475,000.00) over the term in which it wanted to be repaid (13 weeks). Thus, Overtime Capital set forth in its MCA agreement that it would be paid $190,385.00 per week ($2,475,000.00 divided by 13 is $190,385.00). If amortized annually, Overtime Capital was charging an effective annual interest rate of 412%.

117.    Clearly, the "percentage of future receivables being purchased" is just a random number with no basis in reality. The MCA Agreements at issue for all of the MCA-Funders here are just representative of a loan term being a fixed amount of time within which the MCA-Funder Defendant is required to be repaid.

118.    The comparison between Epic Advance and Overtime Capital is illustrated below:

| Date of Agreement | MCA Funder | Percentage of Receivables 'Purchased' | Set Weekly Payment |
|---|---|---|---|
| November 25, 2025 | Epic Advance | 26.88% | $50,000.00 |
| December 24, 2025 | Overtime Capital | 25% | $190,385.00 |

119.    Thus, while both MCA-Funder Defendants examined the same Hillcour bank statements (usually the full extent of the due diligence an MCA-Funder performs), Epic Advance determined that 26.88% of Hillcour's weekly receipts is $50,000.00 but a few weeks later, Overtime Capital determined that 25% of Hillcour's weekly receipts was $190,385.00. If these companies were truly purchasing the percentage of daily receivables set forth in their MCA Agreements, the numbers should actually be almost identical. The math here only makes sense if the MCA-Funder Defendants is only *pretending* to purchase a fixed amount of a merchant's daily receivables and just filling in percentages that have no basis in reality.

120.    There could be no doubt that the MCA-Funder Defendants do not craft their agreements with any direct relationship with a company's daily revenue, but only base their agreements on the term in which they want to be repaid and the degree of return (i.e., a 1.5 return in X days).

121.    These agreements are not true receivable purchases, but they are loans.

B.    **The MCA Agreements Each Use a Sham**
**Reconciliation Provision to Disguise the Loans.**

122.    In order to evade usury laws, each of the MCA-Funder Defendants includes a sham reconciliation provision in its MCA Agreements to give the appearance that the loans do not have a definite term.

123.    Under a legitimate reconciliation provision, if Hillcour or Vincent's Drug Store pays more through its fixed daily payments than it actually received in receivables, Hillcour or Vincent's Drug Store would be entitled to seek the repayment of any excess money paid.  Thus, if sales decrease, so do the payments.

124.    Sometimes, however, in order to ensure that a borrower can never use their sham reconciliation provision, the MCA-Funder Defendant would falsely represents that the fixed daily payment amount is a good-faith estimate of the percentage of receivables purchased but they always use a higher percentage in their MCA Agreements.  By doing so, the MCA-Funder Defendant ensures that if sales decrease, the required fixed daily payments remain the same since it allegedly purchased a larger percentage of the company's receivables.

125.    Moreover, on information and belief, none of the MCA-Funder Defendants here actually has a reconciliation department, does not perform any true reconciliations, and has never refunded a merchant money as required under their sham reconciliation provision.  Rather, if a company is struggling with their payments, the MCA-Funder Defendant simply offers a temporary reduction of the payment amount.  This is all arbitrary and never based on an actual mathematical calculation of the percentage of receivables the MCA-Funder Defendant pretends to purchase.

126.    Also, while many of the MCA Agreements specifically requires the MCA-Funder Defendant to reconcile the accounts each month, it never does.

### C.    The Defendants Intentionally Disguise the True Nature of the Transactions.

127.    Despite their documented form, the transactions memorialized in the MCA Agreements between either Hillcour or Vincent's Drug Store and the MCA-Funder Defendants (collectively the "Transactions"), are, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

(a)    The daily payments required by the MCA Agreements were fixed and the so-called reconciliation provision was mere subterfuge to avoid usury laws. Rather, just like any other loan, the purchased amount was to be repaid within a specified time;

(b)    The default and remedy provisions purported to hold the Plaintiffs absolutely liable for repayment of the purchased amount. The loans sought to obligate Hillcour or Vincent's Drug Store to ensure sufficient funds are maintained in a designated account to make the daily payments and, after a certain number of instances of insufficient funds being maintained in the account, Hillcour or Vincent's Drug Store was in default and, upon default, the outstanding balance of the purchased amount became immediately due and owing;

(c)    While the MCA Agreements purported to "assign" all of the Hillcour's or Vincent's Drug Store's future account receivables to each of the MCA-Funder Defendants until the purchased amount was paid, Hillcour or Vincent's Drug Store retained all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, each MCA-Funder Defendant merely acquired a security interest in the Hillcour's or Vincent's Drug Store's accounts to secure payment of the purchased amount;

(d)    Unlike true receivable purchase transactions, the Transactions were underwritten based upon an assessment of Hillcour's or Vincent's Drug Store's credit worthiness; not the creditworthiness of any imaginary account debtor (like in an ordinary factoring/receivable sale agreement);

(e)    The purchased amount was not calculated based upon the fair market value of Hillcour's or Vincent's Drug Store's future receivables, but rather was unilaterally dictated by the MCA-Funder Defendants based upon the return in desired to earn on the Transaction.  Indeed, as part of the underwriting process, none of the MCA-Funder Defendants ever requested any information concerning Hillcour's or Vincent's Drug Store's imaginary account debtors upon which to make a fair market determination of their value;

(f)    The amount of the daily payments was determined based upon when the MCA-Funder Defendant wanted to be paid, and not based upon any good-faith estimate of Hillcour's or Vincent's Drug Store's future account receivables;

(g)    The MCA-Funder Defendants never assumed a risk of loss due to Hillcour's or Vincent's Drug Store's failure to generate sufficient receivables because the failure to maintain sufficient funds in Hillcour's or Vincent's Drug Store's bank account constituted a default under the agreements;

(h)    The MCA-Funder Defendant required that Hillcour or Vincent's Drug Store undertake certain affirmative obligations and make certain representations and warranties that were aimed at ensuring the company would continue to operate and generate daily income and a breach of such obligations, representations and warranties constituted a default, which fully protected each of the MCA-Funder Defendants from any risk of loss resulting from Hillcour's or Vincent's Drug Store's failure to generate daily income; and.

(i)    Each MCA-Funder Defendant required that Hillcour or Vincent's Drug Store grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which each MCA-Funder Defendant knew was breached from day one.

128.    Each MCA-Funder Defendant also shows in its underwriting practices that their agreements are loans.    Typically, factoring companies and other institutions that purchase account receivables, perform extensive due diligence into the credit worthiness of the account debtors whose receivables they are purchasing.

129.    Each of the MCA-Funder Defendant also collect upon their agreements by treating them just like loans.    For example, each MCA-Funder Defendant requires that Hillcour or Vincent's Drug Store enter into an MCA Agreement, make fixed daily payments and grant security interests in all of its credit card receipts and the MCA-Funder Defendant states that it is entitled to 100% of the credit card receipts so that its full loan can be repaid immediately if just a few daily payments are missed.

130.    In other words, each MCA-Funder Defendant structures its transactions to function just like the loans they are intended to be and not the receivable purchases they purport to be.

131.    Plaintiffs unknowingly and unwittingly fell victim to all of these predatory tactics.

**D.    None of the MCA Agreements Was True Sale of Future Receivables**.

132.    Notwithstanding their titles, the MCA Agreements were not the sale/purchase of receivables.    Plain and simple, there were loans.

133.    The MCA Agreements have none of indicia of a true sale and all the indicia of a loan.    Among other things: (i) each of the MCA Agreements failed to transfer the risk and benefits of ownership of the future receivables from Hillcour or Vincent's Drug Store to the

MCA-Funder Defendant; (ii) Hillcour or Vincent's Drug Store remained absolutely liable for repayment of the full 'purchased amounts'; (iii) Each MCA-Funder Defendant had full recourse rights against Hillcour and/or Vincent's Drug Store and its principal; (iv) the daily/weekly payments amounts were fixed and required payment within the specific time period chosen by the MCA-Funder Defendant; and (v) each of the MCA-Funder Defendant's reconciliation provisions is a sham.

134.    Also, by the time that many of the later MCA Agreements were executed by the Hillcour, there clearly were no pretend future receipts left to allegedly be purchased since Hillcour had already allegedly sold over 100% of its weekly revenue to earlier MCA-Funder Defendants.  This simply further evidences the nature of the sham.

> **E.    The Terms of Each of the MCA Agreement Fail to Transfer the Risks and Benefits of Ownership of Future Receivables from Hillcour and Vincent's Drug Store to the MCA Funder Defendant**.

135.    The *sine qua non* of any sale is that absolute title and ownership of the allegedly purchased good transfers from the seller to the buyer.  That did not occur in connection with any of the MCA Agreements or Transactions here.

136.    In other words, notwithstanding the sale and assignment language of the MCA Agreements, all of the benefits and risks of ownership of the future income remained with either Hillcour or Vincent's Drug Store.

137.    Pursuant to the each of the MCA Agreements, the pretend seller (Hillcour or Vincent's Drug Store) was responsible for generating sufficient weekly income and depositing a "Specified Percentage" of each transaction into a designated account so that the MCA-Funder Defendant could debit the daily or weekly payments.

138.    So long as Hillcour and/or Vincent's Drug Store was able to pay its daily loan payments to the MCA Funder Defendant, the pretend seller (here, Hillcour or Vincent's Drug

Store) was free to use the remaining proceeds of any transaction, including the proceeds of a supposedly purchased future receipt, in its daily operations.

139.    Indeed, the excess proceeds were supposedly Hillcour's or Vincent's Drug Store's only source of operating capital because each of the MCA Agreements specifically prohibited Hillcour or Vincent's Drug Store from further encumbering the future income.  Thus, Hillcour or Vincent's Drug Store had to use the proceeds of the allegedly purchased future receipts in order to operate its business.

140.    Hillcour's or Vincent's Drug Store's complete dominion and control over the future receipts and its right to use the proceeds of the alleged purchased future receipts are entirely inconsistent with a sale because such control and rights are the benefits of ownership that would pass to the seller if the MCA Agreements were a true sale.

141.    Similarly, Hillcour or Vincent's Drug Store retained all risk of loss associated with non-payment of the future receipts.  Among other things, if a particular future receipt was not collectible, there was no reduction in the purchased amount and the MCA-Funder Defendant would simply be repaid from the next collected future receipt or the proceeds of any other sale transaction (which was actually always being funded by one of the factoring companies).

### F.    Hillcour/Vincent's Drug Store Remained Absolutely Liable for Repayment of the Purchased Amount

142.    By operation of the default rights and remedies under the MCA Agreements, repayment of the purchased amount was put beyond any risk of non-payment and Hillcour or Vincent's Drug Store remained absolutely liable for repayment of the purportedly purchased amounts.

143.    Under each of the MCA Agreements, if an event of default occurred, Hillcour or Vincent's Drug Store, as the pretend sellers of the future receipts, immediately became liable for

the full outstanding purchased amounts, together with additional fees and costs due under the MCA Agreements.

144.    An event of default is defined under the MCA Agreements so that a default would occur under any and every conceivable circumstance wherein the pretend seller (Hillcour or Vincent's Drug Store failed to generate or collect future income to repay the MCA-Funder Defendant its fixed daily payment amount.

145.    Most importantly, the failure of Hillcour or Vincent's Drug Store (the pretend seller of the future receipts) to generate and collect sufficient revenue to make the daily payments would automatically constitute an Event of Default under each of the MCA Agreements after just a few days of having insufficient funds ("NSF") in the account which is set up for automatically daily ACH debits.

146.    It would also be an Event of Default under each of the MCA Agreements if Hillcour or Vincent's Drug Store (the pretend seller of the future receipts): (i) violated any term of the agreements; (ii) transferred or otherwise sold its assets; or (iii) moved, terminated, interrupted or suspended its business in any way.  Accordingly, even if Hillcour's or Vincent's Drug Store's business was destroyed or suspended by a hurricane, flood, fire, a pandemic or other Act of God, it would be in default of the MCA Agreements and, pursuant to the remedies provided by such Agreement, each Plaintiff would be immediately liable for the full outstanding balance of purchased amount, plus all fees and costs due under the MCA Agreement.

### G.    Each MCA-Funder Defendant Retained Full Recourse Rights

147.    In order to further ensure its performance under each of the MCA Agreements, Hillcour or Vincent's Drug Store granted each MCA-Funder Defendant a security interest in substantially all of its assets including all of its all accounts and credit card receipts, not just that small percentage that was allegedly sold to each of the MCA-Funder Defendants (the "Collateral").

148.    Upon an Event of Default, each MCA-Funder Defendant was entitled to exercise all of their rights and remedies under the UCC.

149.    Thus, if Hillcour or Vincent's Drug Store (the pretend seller of the future receipts) missed as few daily payments, for any reason whatsoever, each MCA-Funder Defendant could foreclose on the Collateral and receive 100% of the income until the MCA-Funder Defendant was fully paid.

150.    Such recourse provisions are not indicative of a true sale, but rather, a loan.

### H.    The Daily Payments Were Fixed and Resulted in a Usurious Interest Rate

151.    On the face of each of the MCA Agreements, each of the business-entity Plaintiffs were required to repay the pretend 'purchased amount' through daily or weekly ACH debits from a designated account as follows:

**For Hillcour:**

| MCA-Funder Defendant | Purchase Price | Purchased Amount | Payment | No. of Payments | Interest rate |
|---|---|---|---|---|---|
| Apple Advance | $300,000.00 | $495,000.00 | $16,500.00/day | 30 daily | 660% |
| Dynasty Capital | $1,250,000.00 | $1,875,000.00 | $170,454.55/wk | 11 weekly | 312% |
| Epic Advance | $400,000.00 | $600,000.00 | $50,000.00/wk | 12 weekly | 292% |
| Overtime Funding | $1,650,000.00 | $2,475,000.00 | $190,385.00/wk | 13 weekly | 412% |

**For Vincent's Drug Store:**

| MCA-Funder Defendant | Purchase Price | Purchased Amount | Payment | No. of Payments | Interest rate |
|---|---|---|---|---|---|
| Timeless Funding | $1,000,000.00 | $1,500,000.00 | $62,500.00/wk | 24 weekly | 163% |

152.    Once you account for the fees charged, the interest rates are even higher and the amount funded/purchase price is lower:

**For Hillcour:**

| MCA-Funder Defendant | Purchase Price | Purchased Amount | Payment | No. of Payments | Interest rate |
|---|---|---|---|---|---|
| Apple Advance | $239,950.00 | $495,000.00 | $16,500.00/day | 30 daily | 1058% |
| Dynasty Capital | $1,100,000.00 | $1,875,000.00 | $170,454.55/wk | 11 weekly | 434% |
| Epic Advance | $360,000.00 | $600,000.00 | $50,000.00/wk | 12 weekly | 384% |
| Overtime Funding | $1,485,000.00 | $2,475,000.00 | $190,385.00/wk | 13 weekly | 495% |

**For Vincent's Drug Store:**

| MCA-Funder Defendant | Purchase Price | Purchased Amount | Payment | No. of Payments | Interest rate |
|---|---|---|---|---|---|
| Timeless Funding | $900,000.00 | $1,500,000.00 | $62,500.00/wk | 24 weekly | 213% |

153.    There can be no question that the daily payments under each of the MCA Agreements were fixed.

154.    Under each of the MCA Agreements, Hillcour or Vincent's Drug Store (the pretend seller of the future receipts) was obligated to repay the Purchased Amount by remitting a concocted 'specified percentage' of its 'daily receipts' or 'weekly receipts' into a specific designated account (the "Designated Account") and the MCA-Funder Defendant would debit the daily payment from the Designated Account.

155.    While the daily payments were supposed to equal a specified percentage Hillcour's or Vincent's Drug Store's (the pretend seller of the future receipts) daily/weekly receipts, in reality, the daily/weekly payments reflected nothing more than how quickly the

MCA-Funder Defendant wanted to get paid (i.e., 30 days for Apple Advance or 12 weeks for Epic Advance).

156.    The sham is revealed on the face of the MCA Agreements themselves.  Many times, even advances a few weeks apart resulted in widely different daily payment amounts. Compare, for example, the two agreements from Epic Advance and Overtime Capital (Exhibits C and D).

157.    This is true despite the fact that each MCA-Funder Defendant was given viewing access to Hillcour's or Vincent's Drug Store's (the pretend seller of the future receipts) bank accounts "in order to calculate the amount of such payments."  In other words, each MCA-Funder Defendant undertook to calculate, on daily basis, what the fixed percentage of Hillcour's or Vincent's Drug Store's (the pretend seller of the future receipts) would be and, on or about a certain day of every month, the MCA-Funder Defendant was supposed to reconcile their collections with the Hillcour's or Vincent's Drug Store's (the pretend seller of the future receipts) actual receipts to ensure that they never collected more than that fixed percentage of the receipts on a monthly basis.

158.    However, despite being given viewing access to the Hillcour's or Vincent's Drug Store's (the pretend seller of the future receipts) bank accounts for the express purpose of reconciling them, none of the MCA-Funder Defendants ever actually performed any reconciliation of Hillcour's or Vincent's Drug Store's (the pretend seller of the future receipts) bank account nor did they ever intend to do so because the daily payments were not an actual estimate of the fixed percentage of Hillcour's or Vincent's Drug Store's (the pretend seller of the future receipts) daily receipts but rather, they were simply a reflection of how quickly the MCA-Funder Defendant wanted to be repaid.

I. **The Corporate Plaintiffs Have Had its Businesses, Finances,
and Credit Demolished as a Result of Defendants' Conduct**

159. The Defendants inflicted immense financial and personal harm upon Plaintiffs,
who they purport to help.  Plaintiffs were pressured into deceptive and lopsided agreements, each
MCA-Funder Defendant loaned money to Hillcour or Vincent's Drug Store at triple-digit interest
rates and wrongly seize large sums from Hillcour's or Vincent's Drug Store's bank accounts,
which then resulted in Hillcour or Vincent's Drug Store having to look to other similar merchant
cash advance lenders which resulted in the spiral of unending debt we see here.

160. Each Defendant is responsible for the usurious, fraudulent, and illegal conduct set
forth herein.

**FIRST CAUSE OF ACTION
(RICO:  18 U.S.C. § 1962)**

161. Plaintiffs adopt and reallege paragraphs 1 through 156 as if fully set forth herein.

A. **The Unlawful Activity**

162. More than a dozen states, including New York and Virginia, place limits on the
amount of interest that can be charged in connection with providing a loan.

163. In 1965, the Legislature of New York commissioned an investigation into the
illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

164. As recognized by the New York Court of Appeals in *Hammelburger v. Foursome
Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on
Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the
Governor and the public the need for change in both, as well as for change in the immunity
statute, and for provisions making criminal the possession of loan-shark records and increasing

the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

165.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

166.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

167.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

168.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

169.    Like here, this was a purely artificial device used by the loan-sharks to evade the law - an evasion that the Legislature sought to prevent.

170.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

**B.    Culpable Persons**

171.    Each of the MCA-Funder Defendants, as well as the various officers and owners of each of the MCA-Funder Defendants, and the investors in these MCA-Funder Defendants, and the brokers and ISOs who participated in this illegal scheme (and whose identities will be sought during the course of discovery in this case) are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

172.    At all relevant times, each of the various officers, owners, and investors, brokers and ISOs ("Independent Sales Organizations") of each of the MCA-Funder Defendants (the

"RICO Persons") was, and is, a person that exists separate and distinct from the MCA-Funder Defendant itself.

173.   The officers of the MCA-Funder Defendants, who will be identified through discovery, manage and direct one or more of the MCA-Funder Defendants and knowingly participated in the enterprise and the fraudulent scheme described above.

174.   The owners of the MCA-Funder Defendants, who will be identified through discovery, have an ownership interest in one or more of the MCA-Funder Defendants and knowingly participated in the enterprise and the fraudulent scheme described above.

175.   The investors of the MCA-Funder Defendants, who will be identified through discovery, invest capital into one or more of the MCA-Funder Defendants, and receive a significant return on his/her/its investment, and knowingly participated in the enterprise and the fraudulent scheme described above.

176.   Through their operation of the MCA-Funder Defendants, the RICO Persons solicit, underwrite, fund, service and collect upon lawful debt incurred by small businesses in New York (which has usury laws) and other states that do not have usury laws.

**C.      The Enterprise**

177.   Each of the MCA-Funders, together with its respective as officers, owners and investors, together with the network of independently owned and operated brokers and ISOs (such brokers and ISOs operate within the business lending space and are separately owned/operated intermediaries between businesses (like Plaintiffs herein) and the funding companies) constitute an Enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (each, an "Enterprise").

178.   Each of the MCA-Funders, together with its respective as officers, owners, and investors, and the brokers and ISOs, are associated in fact and through relations for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, each Enterprise has a

common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York, Florida and other states.

179.    The members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States.

180.    The debt, including such debt evidenced by the MCA Agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) 18 U.S.C. § 1961(6) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

181.    Each MCA-Funder Defendant and the various other members of each Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of collecting upon fraudulent fees through electronic wires.

182.    Each Enterprise's conduct constitutes "fraud by wire" within the meaning of 18 U.S.C. 1343, which is "racketeering activity" as defined by 18 U.S.C. 1961(1).  Its repeated and continuous use of such conduct to participate in the affairs of the Enterprise constitutions a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

**C.    The Roles of the RICO Persons in Operating the Enterprise, and the Roles of the MCA-Funder Defendants within the Enterprise.**

183.    The RICO Persons of each Enterprise have organized themselves and the Enterprise into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

The Owners and Officers

184.    The John/Jane Doe Defendants who are the owners and officers are the masterminds of each Enterprise.  They are responsible for the day-to-day operations of the Enterprise and have final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan.

185.    In such capacity, the John/Jane Doe Defendants who are the owners and officers of each Enterprise are responsible for creating, approving and implementing the policies, practices and instrumentalities used by each Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily or weekly payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All such forms were used to make and collect upon the unlawful loans including, without limitation, loans extended to the Plaintiffs here.

186.    The John/Jane Doe Defendants who are the owners and officers of each Enterprise also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

187.    The John/Jane Doe Defendants who are the owners and officers of each Enterprise have ultimately benefited from the Enterprise's funneling of the usurious loan proceeds to the owners and investors.

The MCA-Funder Defendants

188.    Each of MCA-Funder Defendants is a corporation or limited liability company organized under the laws of the state of New York or such other state of organization/incorporation set forth above. Each of the MCA-Funder Defendants maintains officers, books, records, and bank accounts independent of the John/Jane Doe Defendants who are the owners, officers and investors of each Enterprise.

189.    Each of the MCA-Funder Defendants are operated as part of an unlawful enterprise to collect upon unlawful debt and commit wire fraud. Pursuant to his/her/its membership in an Enterprise, the John/Jane Doe Defendants who are the owners and officers of each Enterprise has: (i) entered into contracts with brokers to solicit borrowers for the Enterprise's usurious loans and participation agreements with the John/Jane Doe Investor Defendants to fund the usurious loans; (ii) pooled the funds of Investors in order to fund each usurious loan; (iii) underwritten the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entered into the so-called merchant agreements on behalf of the Enterprise; (v) serviced the usurious loans; (vi) set-up and implemented the ACH withdrawals used by the Enterprise to collect upon the unlawful debt; and (v) obtained judgments in its name to further collect upon the unlawful debt.

190.    In this case, the John/Jane Doe Defendants who are the owners and officers of each Enterprise and the John/Jane Doe Investors: (i) solicited borrowers; (ii) pooled funds from Investors to fund the MCA Agreements; (iii) underwrote the MCA Agreements; (iv) entered into the MCA Agreements; and (v) collected upon the unlawful debt evidenced by the MCA Agreements by effecting daily ACH withdrawals from the bank accounts of one or more of the Plaintiffs.

The John/Jane Doe Investors

191.    The John and Jane Doe Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of MCA-Funder Defendants.

192.    Directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing MCA-Funder Defendants with all or a portion of the pooled funds necessary to fund the usurious loans, including the MCA Agreements, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

193.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors according to their level of participation in the usurious loans.

The John/Jane Doe Brokers and ISOs

194.    The John and Jane Doe Brokers and ISOs are the various independent brokers and independent sales organizations (ISOs) who operate within this business lending space but are separately owned/operated intermediaries between businesses (like Plaintiffs herein) and the funding companies (the MCA-Funder Defendants) that provide capital directly to the businesses.

195.    Very often, it is the broker or ISO that has direct communication with the merchant businesses like Plaintiffs herein and solicits them to obtain business funding through one or more of the MCA-Funder Defendants.  These independently owned and operated brokers and ISOs are critical to the enterprise and provide a steady stream of merchants to whom the MCA-Funder Defendants provide the funding.

E.       **Interstate Commerce**

196.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

197.    Specifically, members of each Enterprise maintain offices in either New York and/or New Jersey and use personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to Hillcour or Vincent's Drug Store in Florida and South Carolina, and throughout the United States, via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house.

198.    In the present case, much of the communications between the members of each Enterprise, were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications.    Specifically, each Enterprise used interstate emails to originate, underwrite, service and collect upon the Agreements, fund the advances under each of the Agreements and collect the daily or weekly payments via interstate electronic ACH debits.

F.       **Each MCA Funder is Engaged In an**
         **Open-Ended Pattern of Racketeering Activity**

199.    Each MCA-Funder Defendant is engaged in an open-ended pattern of racketeering activity and such racketeering acts pose a threat of continuing criminal activity beyond the period during which the predicate acts alleged herein were performed.

200.    Each of the MCA-Funder Defendant's Agreements with Hillcour or Vincent's Drug Store is not just an isolated acts/agreement.    Rather, each of the MCA-Funder Defendants were, at all materials times, and still are, in the business of lending money at usurious rates. Indeed, Lending money at usurious rates was, and still is, the principal business of each of the MCA-Funder Defendants.

201.    A search of the New York Court's NYSCEF system using each MCA-Funder Defendant's name will bring up several, if not dozens upon dozens, of other cases where each MCA-Funder Defendant has sued another business/merchant and includes with its filing a copy of an identical (or virtually identical) MCA agreement to the one at issue in the within case. The entire operation being conducted by each of the MCA-Funder Defendants, using both its own employees and independent ISO and brokers, constitutes an unlawful enterprise (lending money at usurious rates) in violation of the RICO laws.

202.    The primary business of each MCA-Funder Defendant is to engage in racketeering activity (i.e., the unlawful collection of debt from numerous businesses/merchants), the predicate acts are inherently unlawful and there is a threat of continued criminal activity. Accordingly, there is an open-ended pattern of racketeering activity.

### F.    Injury and Causation.

203.    Each Plaintiff has and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c).

204.    The injuries to each Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d) include, but are not limited to, hundreds of thousands of dollars in improperly collected criminally usurious loan payments and the unlawful entry and enforcement of judgments.

205.    Each Plaintiffs has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

206.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from Defendants.

## SECOND CAUSE OF ACTION
### (CONSPIRACY UNDER 18 U.S.C. § 1962(d))

207.    Plaintiffs adopt and reallege paragraphs 1 through 202 as if fully set forth herein.

208.    Each Defendant has unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed, together with the other members of his/her/its Enterprise, to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

209.    By and through each of the Defendants' business relationships with the other members of his/her/its Enterprise, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among such Defendants concerning the underwriting, funding, servicing and collection of the unlawful loans, including the MCA Agreements, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants in his/her/its Enterprise were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

210.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of an Enterprise's affairs in order to collect upon unlawful debts, including the MCA Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in one or more of the Enterprises and its affairs, and each of the of the MCA-Funder Defendants.

211.    The Defendants who participated in each Enterprise shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the MCA Agreements within that Enterprise.

44

212.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of such Enterprise's affairs in order to commit wire fraud through a pattern of racketeering activity in violation of 18 U.S.C. 1962(c).

213.    The participation and agreement of each of Defendant in the Enterprise was necessary to allow the commission of this scheme.

214.    Each Plaintiff has been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at the hearing.

215.    The injuries to each Plaintiff are directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, millions of dollars in improperly collected loan payments.

216.    Each Plaintiff has also suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

217.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs are entitled to treble damages, plus costs and attorneys' fees from the Defendants.

**THIRD CAUSE OF ACTION**
**(BREACH OF CONTRACT)**

218.    Plaintiffs adopt and reallege paragraphs 1 through 156 as if fully set forth herein.

219.    Assuming a valid contract existed, each MCA-Funder Defendant breached the respective and applicable MCA Agreement by:

    a.  Refusing to reconcile the daily or weekly payments and have such payments be a true reflection of the daily receipts based on the amount of receivables allegedly purchased; and

    b.  Not funding the amount required under the respective agreement.

220.    Each of the Plaintiffs suffered damages as a direct and proximate result of MCA-Funder Defendant's breach.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment in their favor against Defendants and seek an Order:

a)    Declaring each of the MCA Agreements to be a usurious loan in violation of New York Penal Law §190.40 and thus void and unenforceable;

b)    Awarding compensatory, direct, and consequential damages, including prejudgment interest, in an amount to be determined at a hearing;

c)    Awarding treble damages;

d)    Requiring Defendants to pay Plaintiffs' attorneys' fees and costs; and

e)    Any further relief deemed appropriate by the Court.

Dated this 20th day of February, 2026.

Respectfully submitted,

 /s/  John M. Stravato
**JOHN M. STRAVATO, ESQ.**
34 E. Main Street, # 219
Smithtown, New York  11787
Email: johnmstravato@gmail.com
Telephone:  (516) 633-2639
*Trial Counsel for Plaintiffs*

## VERIFICATION

I, Damien Lamendola, declare as follows:

1.     At all relevant times, I was the President of both corporate Plaintiffs, HILLCOUR, INC., VINCENT'S DRUG STORE AND SODA FOUNTAIN, INC., in this action.

2.     As such, I have personal knowledge of the facts set forth herein and if called to testify as to these matters would do so competently.

3.     I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 20.00 day of February, 2026.

DocuSigned by:

Damien Lamendola

474FA3F3A1C34CA

Damien Lamendola